Exhibit "2"



**DEPARTMENT OF JUSTICE | OFFICE OF THE INSPECTOR GENERAL**

# PANDEMIC RESPONSE REPORT

20-086

**JULY 2020**

## Remote Inspection of Federal Correctional Complex Lompoc

EVALUATION AND INSPECTIONS DIVISION

11

# INTRODUCTION



**OIG COVID-19 Inspection Efforts**

In response to the coronavirus disease 2019 (COVID-19) pandemic, the U.S. Department of Justice (Department, DOJ) Office of the Inspector General (OIG) initiated a series of remote inspections of Federal Bureau of Prisons (BOP) facilities, including BOP-managed institutions, contract institutions, and Residential Reentry Centers (RRC). In total, these facilities house approximately 160,000 federal inmates. The OIG inspections sought to determine whether these institutions were complying with guidance related to the pandemic, including Centers for Disease Control and Prevention (CDC) guidelines, DOJ policy and guidance, and BOP policy. While the OIG was unable to meet with staff or inmates as part of these remote inspections, the OIG issued a survey to over 38,000 BOP employees, as well as staff of contract institutions and RRCs.

DOJ COVID-19 Complaint

Whistleblower Rights and Protections

The CDC has noted that the confined nature of correctional facilities, combined with their congregate environments, "heighten[s] the potential for COVID-19 to spread once introduced" into a facility. According to BOP data, as of July 14, 2020, 8,642 inmates and 887 staff in BOP-managed institutions and community-based facilities have tested positive for COVID-19.[1] However, testing within most BOP facilities has been limited. In those institutions where widespread inmate testing has been undertaken, including at one of the four facilities at the Federal Correctional Complex (FCC) Lompoc in Santa Barbara County, California, the percentage of inmates testing positive has been substantial. For example, at the one FCC Lompoc facility where all inmates were tested, the number of inmates testing positive for COVID-19 exceeded 75 percent as of May 11. Separately, as of early May, at least 53 of the 416 staff members at FCC Lompoc had been tested and approximately 60 percent (32 of 53) of those individuals tested positive.

Between April 23 and May 1, 2020, the OIG conducted a remote inspection of FCC Lompoc to understand how the COVID-19 pandemic affected the complex and to assess the steps Lompoc officials took to prepare for, prevent, and manage COVID-19 transmission within its facilities (see Appendix 1 for the scope and methodology of the inspection). As part of that effort, we considered whether Lompoc's policies and practices complied with BOP directives implementing CDC guidance, as well as DOJ policy and guidance. We conducted the inspection through telephone interviews with FCC Lompoc and BOP officials, review of documents, assessment of inmate demographic data and staff and inmate COVID-19 case data by the OIG's Office of Data Analytics (ODA), analysis of FCC Lompoc-specific results from a BOP-wide employee survey regarding COVID-19 issues that the OIG conducted in late April, and consideration

---

[1] This estimate does not include inmates who have tested positive, recovered, and have since been released by the BOP.

of complaints to the OIG Hotline and by an FCC Lompoc union official (see Appendix 2 for a summary of survey results from FCC Lompoc).

## Summary of Inspection Results

The findings of the OIG's remote inspection of FCC Lompoc are as follows:

- A preexisting shortage of medical staff at Lompoc was among the biggest challenges in mitigating COVID-19 transmission because of the burdens of screening inmates and staff members for COVID-19 symptoms while still providing routine medical care to the institution's approximately 2,700 inmates.

- An insufficient number of correctional staff members resulted in Lompoc officials delaying full implementation of staff movement restrictions until 15 days after the BOP directed institutions with COVID-19 cases to further modify operations to maximize social distancing in facilities to help control the spread of infection.

- Lompoc's initial COVID-19 screening process was not fully effective. We identified two staff members who came to work in late March after experiencing COVID-19 symptoms and whose symptoms were not detected in the screening process to preclude them from working.

- Lompoc staff did not seek to test or isolate an inmate who reported on March 22 that he began having COVID-19 like symptoms 2 days earlier and who was examined on 4 separate days between March 22 and 26. The local hospital tested the inmate for COVID-19 on March 27, and his results came back positive on March 30.

- The lack of a permanent leadership team and the physical characteristics of Lompoc facilities contributed to deficiencies in Lompoc's response to COVID-19.

- The OIG's BOP-wide survey in late April 2020 reflected that Lompoc staff identified as immediate needs at that time more personal protective equipment for staff and hygiene supplies for inmates, additional staff to cover posts, and more space to quarantine inmates.

- The BOP's use of home confinement in response to the spread of COVID-19 at FCC Lompoc in April, as a mechanism to reduce either the at-risk inmate population or the overall prison population in order to assist with social distancing, was extremely limited. As of May 13, over 900 Lompoc inmates had contracted COVID-19 and we determined that only 8 inmates had been transferred to home confinement in accordance with BOP guidance.

We describe these findings in greater detail, and other observations we made during our inspection, in the Inspection Results section of this report.

## COVID-19 at FCC Lompoc

At the time of our inspection, FCC Lompoc housed approximately 2,700 medium, low, and minimum security male inmates in four separate facilities in Lompoc, California:  a U.S. Penitentiary (USP), a Federal Correctional Institution (FCI), and two camps.  As a Care Level 2 complex, FCC Lompoc's population includes inmates with chronic care needs.[2]  The institution had more than 400 BOP correctional staff who provided daily correctional services to inmates.

FCC Lompoc learned of its first positive COVID-19 test result of a staff member on March 27 and of its positive test of an inmate on March 30.  The inmate had preexisting health issues and had been hospitalized since March 26.  On May 4, FCC Lompoc expanded inmate COVID-19 testing to include testing all of the FCI's 1,162 inmates.  By May 11, the BOP reported that FCC Lompoc had 25 staff and 912 inmates with active COVID-19 and that 2 inmates had died from COVID-19.[3] Below, we provide a snapshot of FCC Lompoc's COVID-19 outbreak as of July 13.



Inmate Population[a]

2,587

Active Inmate Cases[b]

8

Inmate Deaths[c]

4

Active Inmate COVID-19 Cases Over Time, March 31–July 13, 2020[b]

[a] As of June 14, 2020.  Population totals may differ from BOP statistics due to categories of inmates (e.g., juveniles) excluded from the data received by the OIG.

[b] As of July 13, 2020.  The BOP defines "active cases" as open and confirmed cases of COVID-19.  Once someone has recovered or died, he or she is no longer considered an active case.

[c] As of July 13, 2020.  Deaths due to COVID-19.

**Data Source:**  BOP

---

[2]  BOP officials assign each inmate a care level based on the inmate's individual medical needs.  Care levels range from Care Level 1 for the healthiest inmates to Care Level 4 for inmates with the most serious medical conditions.  The BOP also assigns each institution a care level from 1 to 4, based on the institution's level of medical staffing and resources.  The goal of the care level system is to match inmate medical needs with institutions that can meet those needs.  A Care Level 2 institution is capable of treating inmates with conditions requiring clinical contact every 3 months.

[3]  The BOP defines "active cases" as open and confirmed cases of COVID-19.  Once someone has recovered or died, he or she is no longer considered an active case.

DOJ Federal Staff[a]

 416

Active Staff Cases[b]

 2

Staff Deaths[c]

 0



Active Staff COVID-19 Cases Over Time, March 31–July 13, 2020[b]



[a] As of June 25, 2020.

[b] As of July 13, 2020.  Active cases are open and confirmed cases of COVID-19.  Once someone has recovered or died, he or she is no longer considered an active case.

[c] As of July 13, 2020.  Deaths due to COVID-19.

**Data Sources:**  BOP, National Finance Center

Total Confirmed Santa Barbara County COVID-19 Cases Over Time, March 31–July 13, 2020[a]



[a] As of July 13, 2020.  Total confirmed cases are cumulative positive COVID-19 cases.

**Data Source:**  Johns Hopkins University Center for Systems Science and Engineering

# TABLE OF CONTENTS

INSPECTION RESULTS ................................................................................................................ 1

    Preexisting Staffing Shortages ......................................................................................... 1

    COVID-19 Staff Screening Procedures ............................................................................ 3

    COVID-19 Testing .............................................................................................................. 5

    Personal Protective Equipment and Cloth Face Coverings ........................................... 7

    Lack of Permanent Leadership and Communications Protocols ................................... 9

    Conditions of Confinement, Visitation, Commissary, and Hygiene Products ....................... 10

    Quarantine Procedures .................................................................................................... 12

    Use of Home Confinement and Compassionate Release Authorities .................................... 13

APPENDIX 1:  SCOPE AND METHODOLOGY OF THE INSPECTION ....................................... 24

APPENDIX 2:  OIG COVID-19 SURVEY RESULTS FOR FCC LOMPOC ................................... 25

APPENDIX 3:  TIMELINE OF BOP GUIDANCE .......................................................................... 29

# INSPECTION RESULTS

## Preexisting Staffing Shortages

Lompoc's Health Services Administrator told the OIG that prior to the COVID-19 outbreak the institution's medical staffing was at only 62 percent.[4]  We found that this preexisting shortage of medical staff may have negatively impacted FCC Lompoc's ability to conduct screenings of inmates and staff members for COVID-19 symptoms, a time-consuming process that had to be performed on a regular schedule while also providing routine medical care to the institution's approximately 2,700 inmates.  Lompoc's Clinical Director stated that medical staffing has been the biggest challenge in addressing the institution's treatment demands and that COVID-19 exacerbated Lompoc's existing medical staff shortage, particularly in light of two paramedics and a physician who were on sick leave for significant periods of time.[5]  As of April 30, the BOP had designated 9 temporary duty (TDY) medical staff to FCC Lompoc and had increased the institution's medical staffing by approximately 38 percent (from about 24 to 33).[6]

In addition to the shortage of medical staff, we found that a significant shortage in correctional staff affected FCC Lompoc's response to the COVID-19 outbreak, including its ability to promptly implement staff movement restrictions, a measure that was designed to control potential COVID-19 transmission.  Based on information we learned from Lompoc officials and BOP policy, described below, about the importance of limiting staff movement and the effect of staff shortages in doing so, we believe that Lompoc staff shortages through early April may have increased the risk of COVID-19 transmission because the complex did not always have enough staff to allow Correctional Officers to remain in one facility.

---

[4] In response to the working draft of this report, the BOP stated that maintaining adequate levels of medical staff in BOP institutions was an ongoing nationwide challenge.  The OIG's 2016 BOP medical staffing challenges report detailed the serious medical staffing issues facing the federal prison system, and the OIG included this staffing challenge in our recent annual Top Management and Performance Challenges report.  See DOJ OIG, *The Federal Bureau of Prisons' Medical Staffing Challenges*, Evaluation and Inspections Division (E&I) Report 16-02 (March 2016), www.oversight.gov/sites/default/files/oig-reports/e1602.pdf, and DOJ OIG, *Top Management and Performance Challenges Facing the Department of Justice–2019* (October 2019), www.justice.gov/sites/default/files/reports/2019.pdf.

[5] On May 16, on behalf of Lompoc inmates, the American Civil Liberties Union filed a class action lawsuit in the U.S. District Court for the Central District of California alleging that the BOP "failed to conduct timely testing, provide adequate [personal protective equipment], or effectively isolate those who are infected and those who have had contact with the infected." Among other claims, the lawsuit alleged that when an inmate with asthma reported symptoms consistent with COVID-19 he was ignored for days and denied medical treatment until he went into respiratory shock and had to be put on a ventilator. The lawsuit also stated that, "due to the burden on Lompoc's medical resources from COVID-19-related care," another inmate was unable to get needed cancer treatment.  See Yonnedil Carror Torres, Vincent Reed, Felix Samuel Garcia, Andre Brown, Shawn L. Fears v. Louis Milusnic, in His Capacity as Warden of Lompoc, and Michael Carvajal, in His Capacity as Director of the BOP, Case 2:20-cv-04450-CBM-PVC, May 16, 2020.

[6] As of July 13, the Western Regional Office, which is an administrative office providing oversight and support to facilities located in the Western Region including FCC Lompoc, stated that it had approved 18 health services staff from other BOP institutions to support Lompoc's medical services.

On March 13, the BOP directed Wardens to immediately "implement modified operations to maximize social distancing in [BOP] facilities," to the extent practicable.[7]  The BOP supplemented this guidance on March 31, which included an instruction to institutions with COVID-19 cases to limit staff "movement to the areas to which they were assigned, such as departments/posts, whenever feasible to help control the spread of infection."[8]  The same day, the BOP Western Regional Office directed Lompoc to implement these measures and to "develop a plan to minimize, and if possible, eliminate staff movement between the USP, FCI and Camp."  However, it was not until April 14 that the acting Complex Warden sent a memorandum to all FCC staff members stating that "compartmentalization of staff to limit working at different facilities...will begin no later than April 15," which was 15 days after the BOP had directed institutions to take such steps and more than 2 weeks after Lompoc had identified its first COVID-19 cases.[9]  Lompoc officials told us that they could not fully implement the compartmentalization of staff until the arrival of adequate TDY staff because the institution did not have enough staff to fill all mandatory correctional posts, both at FCC Lompoc and at the local hospitals where some Lompoc inmates were receiving care.[10]

In response to these staffing shortages, on March 31 the BOP began deploying TDY staff from other BOP institutions to FCC Lompoc to assist with inmate security, clinical care, administrative oversight, and facility modifications for a mobile hospital (see the text box below).  As of April 30, the BOP had deployed 99 TDY correctional staff, increasing FCC Lompoc's nonmedical staffing complement by approximately 25 percent (from about 390 to 490).  These additional staff members, upon their arrival, assisted Lompoc in managing its COVID-19 outbreak and allowed it to implement the BOP's guidance limiting staff movement.  However, unless the BOP promptly

---

[7] See BOP, memorandum for All Chief Executive Officers, Coronavirus (COVID-19) Phase Two Action Plan, March 13, 2020, 3.

Social distancing, also called "physical distancing," means keeping at least 6 feet between yourself and other people and not gathering in groups.  In a correctional setting, the CDC recommends implementing a host of social distancing strategies to increase the physical space between incarcerated people (ideally 6 feet between all individuals, regardless of the presence of symptoms), noting that not all strategies will be feasible in all facilities and strategies will need to be tailored to the individual space in the facility and the needs of the population and staff.  See CDC, "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," March 23, 2020, www.cdc.gov/ coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (accessed July 15, 2020).

[8] See BOP, memorandum for All Chief Executive Officers, Coronavirus (COVID-19) Phase Five Action Plan, March 31, 2020, 2.

[9] In comparison, for example, FCC Tucson in Tucson, Arizona, an institution in the same BOP region as FCC Lompoc but without staffing concerns or a COVID-19 outbreak in April, fully implemented its staff movement restrictions on April 5. See DOJ OIG, *Remote Inspection of Federal Correctional Complex Tucson,* E&I Report 20-087 (July 2020).

[10] In response to the working draft of this report, the Western Regional Office stated that, after it learned of the first Lompoc staff member who tested positive for COVID-19, it discussed staff assignments with Lompoc officials and they collectively made the decision to readjust the roster to stop relief post assignments that had Lompoc staff members working different areas of the complex.  Though the BOP deployed the first TDY staff member to Lompoc on March 31, BOP documentation indicates that an additional 55 TDY staff members arrived at Lompoc between April 6 and April 14.

takes longer-term actions to address these issues, Lompoc will again face a shortage of medical and correctional staff when TDY staff return to their home institutions.[11]

## COVID-19 Staff Screening Procedures

On January 31, the BOP's Health Services Division issued a memorandum to all BOP institutions informing them of possible COVID-19 symptoms, including fever or chills, cough, shortness of breath, headaches, body or muscle aches, vomiting, and diarrhea.[12]  On February 29, the BOP directed institutions to screen staff with potential COVID-19 risk factors, including staff members who had been in close contact with individuals diagnosed with COVID-19 or staff who had traveled within the previous 14 days through or from locations identified by the CDC as increasing epidemiologic risk.[13]

On March 13, the BOP issued a further directive instructing institutions in areas with "sustained community transmission," which included Lompoc, to implement enhanced health screening of all staff.[14] The memorandum provided that enhanced screening included "self-reporting and temperature checks."

> **USP Lompoc Hospital Care Unit**
>
> On May 4, the BOP announced that it had finalized construction of a Hospital Care Unit (HCU) inside the walls of USP Lompoc in order to care for a projected "level of hospitalization [among Lompoc inmates] the local community would be unable to meet."  The BOP described the HCU as comprising 10 double-occupancy, acute care treatment rooms with negative pressure, as well as a Patient Intake Room, Nurses Station, Pharmacy, Linen Exchange Room, Biohazard Room, and Medical Supply and Storage Room. The BOP also stated that Lompoc had negotiated a contract for medical personnel, including Doctors, Registered Nurses, Paramedics, a Pharmacist, Physician Assistants, Nurse Assistants, and a Clinical Manager, to work in conjunction with the institution's Health Services staff.  As a result, the BOP reported that cases normally requiring outside hospitalization would be treated within the prison, minimizing the impact on the community and further ensuring public safety.  Lompoc's Executive Assistant told the OIG that the HCU started treating inmates on May 15.
>
> **Source:** OIG analysis of BOP documents

According to the BOP, initially all Lompoc staff were required to complete a form and submit to a temperature check.  The BOP stated that subsequent screenings entailed a verbal screening in which screeners asked staff questions related to potential symptoms and performed a temperature check (see the photograph below).  If a staff member had a fever or answered yes to any of the symptom questions, the staff member was required to complete a revised staff screening form.

---

[11]  As of May 1, FCC Lompoc records indicate that 12 TDY staff, including 2 TDY medical staff, had returned to their home institutions.  In response to the formal draft of this report, the BOP stated that off-site medical staff have been performing remote reviews of Lompoc inmates' medical records to fill the gap caused by the departure of TDY medical staff to allow Lompoc's medical staff to focus on on-site medical matters.

[12]  BOP, memorandum for All Clinical Directors, Health Services Administrators, Quality Improvement/Infection Prevention Coordinators, Guidance on 2019 Novel Coronavirus Infection for Screening and Management, January 31, 2020, 2.

[13]  BOP, memorandum for All Clinical Directors, Health Services Administrators, Quality Improvement/Infection Prevention Coordinators, Guidance Update for Coronavirus Disease 2019 (COVID-19), February 29, 2020, 2.

[14]  BOP, memorandum for All Chief Executive Officers, March 13, 2020, 3.

We determined that while FCC Lompoc officials initiated COVID-19 screenings of all staff on March 16, in accordance with BOP policy, its initial screening process was not fully effective. Specifically, we identified two staff members who came to work in late March after experiencing COVID-19 symptoms, but their symptoms were not detected in the screening process. In one case the symptoms the staff member was experiencing were not included in the screening tool in place at Lompoc at the time, even though one of the staff member's symptoms was listed in the BOP's January guidance. As a result, the staff member was allowed to work at the institution despite experiencing those symptoms.[15] In the other case, the staff member was experiencing one of the symptoms that was included in the screening tool but the staff member did not report it because, he told us, he did not think it was COVID-19 related.[16] This staff member worked at Lompoc for 7 days after experiencing his first COVID-19 symptom and before he tested positive for COVID-19 in early April.[17]



FCC Lompoc COVID-19 Staff Screening Center
**Source:** BOP, with OIG enhancement

In addition, numerous Lompoc staff responding to our survey raised concerns about the effectiveness of staff screenings. Several Lompoc staff reported that nonmedical staff were conducting at least some of these screenings and that the institution was not always examining

---

[15] The BOP's Infection Prevention and Control Coordinator told us that the staff member had experienced mild COVID-19 like symptoms, such as fatigue and mild headaches, over the previous days before developing a fever and being tested for COVID-19 on March 26, one day after he last worked. The screening tool in place at the time included fever, cough, and shortness of breath and did not include other possible COVID-19 symptoms, such as headaches and diarrhea, identified in the January BOP guidance. The BOP stated in response to the formal draft of this report that this staff member did not experience any COVID-19 symptoms while working at the institution and developed fever, cough, and a sore throat, and was tested for COVID-19 on March 26. The testimonial evidence we obtained during our inspection indicated that there was at least 1 day that this staff member was symptomatic while working at Lompoc.

[16] The BOP staff member told the OIG that, while he experienced the onset of diarrhea on March 23 and a dry cough on March 26, he cleared the BOP's screening procedures because he did not have a fever and did not report to screeners his cough, which Lompoc staff were screening for at the time. This staff member told us that, when he returned to FCC Lompoc after 2 weeks, the institution was conducting a more in-depth screening for staff symptoms and was denying entry for staff members when they reported symptoms other than fever.

[17] In response to the working draft of this report, the BOP stated that it interviewed this staff member on April 4, after learning of his positive test result, and that was the time the BOP first learned of his COVID-19 symptoms. The BOP reported that Lompoc screened this staff member on each scheduled workday using the nationally approved staff member screening form.

staff for COVID-19 symptoms other than fever. Lompoc officials confirmed the use of both medical and nonmedical staff for COVID-19 screenings, after training nonmedical staff to do so, but asserted that the institution had always screened staff for COVID-19 symptoms other than fever. We believe that the limitations of the BOP's staff screening procecures in March, coupled with Lompoc staff who did not report all COVID-19 symptons to screening staff, may have contributed to the COVID-19 outbreak across FCC Lompoc.

## COVID-19 Testing

We found that testing of inmates and staff at FCC Lompoc was limited in late March, when the institution's COVID-19 outbreak began. On March 13, the BOP issued guidance to institutions regarding the screening of staff and inmates and testing of inmates.[18] Pursuant to the BOP's guidance, enhanced health screening of staff was to be implemented in areas with "sustained community transmission," as determined by the CDC, and at medical referral centers. The memorandum did not address staff testing. For inmates, the guidance provided that symptomatic inmates with exposure risk factors for COVID-19 were to be "isolated and tested" consistent with local health authority protocols.[19]

### Inmate Testing

We found that FCC Lompoc did not seek to test an inmate who, according to Lompoc medical records, informed staff on March 22 that he had begun to experience several different physical symptoms, including nausea, vomiting, and reported general malaise and a dry cough over the prior 2 days. Both vomiting and cough were known symptoms of COVID-19 at that time. According to this inmate's medical records, between March 22 and 26 Lompoc medical staff examined this inmate on four separate days before he was admitted to the local hospital, and that the inmate experienced fatigue, fever, cough, and chills before he was admitted to the hospital on March 26. Lompoc medical notes indicate that, because the inmate had not recently left the institution and had not been in contact with other known COVID-19 cases at the time, medical staff did not suspect that he had contracted the virus.[20] The inmate also had several preexisting

---

[18] BOP, memorandum for All Chief Executive Officers, March 13, 2020, 3.

[19] Isolation is used to separate people who (1) are infected with the virus (those who are sick with COVID-19 and those with no symptoms); (2) are awaiting test results; or (3) have COVID-19 symptoms from people who are not infected. In a correctional setting, the CDC recommends using the term "medical isolation" to distinguish it from punitive action. See CDC, "Interim Guidance."

[20] In response to the working draft of this report, the BOP provided an additional explanation about its process to diagnose and treat this inmate. The BOP stated that Lompoc staff considered COVID-19 for this inmate but determined that this diagnosis was unlikely because there were few COVID-19 cases in the local community, the inmate was afebrile and otherwise had an atypical COVID-19 presentation, and because the inmate denied any contact with anyone diagnosed with COVID-19 in the last 14 days. According to the BOP, this evaluation was consistent with the community standard being used at the time to consider patients for COVID-19. The BOP further stated that the fact that the inmate was seen 4 times in 5 days reflects appropriate ongoing monitoring of the inmate's illness. Finally, on March 26, when his condition was recognized as worsening, the BOP admitted the inmate to the local hospital where much of the focus was on the patient's significant gastrointestinal symptoms as well.

health issues.  Further, according to the BOP's Infection Prevention and Control Coordinator, the hospital did not test the inmate for COVID-19 until March 27 because hospital staff initially suspected that the inmate had an infected gallbladder.  On March 30, the inmate was confirmed to have COVID-19.  Based on the BOP already having identified Lompoc as residing in an area of sustained community transmission, which resulted in the institution implementing enhanced screening protocols for staff by March 16, we believe that Lompoc should have taken greater precautions to isolate an inmate with an indeterminate illness that could have been related to COVID-19.  Keeping this inmate in general population for several days increased the risk of COVID-19 transmission to institution staff and other inmates.[21]

Lompoc officials told us that on March 27 institution medical staff started testing inmates for COVID-19 if they exhibited COVID-19 symptoms.  According to BOP data, FCC Lompoc had tested 121 inmates for COVID-19 as of April 29.[22]

On April 24, the BOP announced that it would expand testing to asymptomatic inmates, initially at institutions such as Lompoc with known COVID-19 cases.[23]  Lompoc officials reported that the institution started testing for all 1,162 FCI inmates on May 4 through a contracted third party.  By May 11, at least 891 FCI inmates had tested positive for COVID-19.  Subsequently, Lompoc officials indicated to the OIG that the institution would not continue testing of all inmates because the outbreak at the USP and camps had subsided and universal testing was no longer warranted, although "targeted testing in specific units that have an active case" might be conducted on an as-needed basis.

## Staff Testing

A BOP official told us that at the onset of the COVID-19 outbreak some staff members faced challenges obtaining testing from their healthcare providers.[24]  The official said that BOP resolved this issue on April 10 by working with the Santa Barbara County Public Health Department, which agreed to test FCC Lompoc staff members who could not otherwise be tested.  Lompoc documentation showed that the Executive Staff sent emails to all staff informing them they could be tested at the Lompoc Health Care Center, a county facility, between 11 a.m. and 12 p.m. on certain days.  At the time of our inspection in early May, at least 53 of the 416 staff members at

---

[21] News media reporting indicates that the first signs of community transmission in Santa Barbara County, California, where FCC Lompoc is located, were already evident as of March 15.  Roselyn Romero, "First COVID-19 Case Reported in Santa Barbara County," *KSBY6 News*, March 15, 2020, www.ksby.com/news/coronavirus/first-COVID-19-case-reported-in-santa-barbara-county (accessed July 15, 2020).

[22] As of July 15, the BOP reported that 1,007 Lompoc inmates had tested positive for COVID-19, 843 inmates had tested negative, and 102 inmates had COVID-19 tests pending.

[23] For more information, see BOP, "BOP Expands COVID-19 Testing," April 24, 2020, www.bop.gov/resources/news/20200424_expanded_testing.jsp (accessed July 15, 2020).

[24] Lompoc officials reported to the OIG that they did not know why community healthcare providers denied COVID-19 testing to the staff members.

FCC Lompoc had been tested and approximately 60 percent (32 of 53) of those individuals had tested positive for the virus.

## Personal Protective Equipment and Cloth Face Coverings

We found that FCC Lompoc officials complied with initial and subsequent BOP directives implementing the CDC's guidance regarding the use of face coverings in correctional settings. However, by April 6, when the BOP directed the distribution of face coverings to all staff and inmates, Lompoc was experiencing both staff and inmate cases and, as subsequent data reflects, transmission and spread of the virus within the institution was already occurring.[25]

Between January 31 and April 6, the BOP issued seven policy directives intended to help its institutions implement evolving CDC guidance concerning the use of personal protective equipment (PPE) and face coverings in various scenarios.[26]  Most notably, the BOP's March 18 directive required all BOP employees performing staff screenings to "wear appropriate personal protective equipment," defined as a "surgical mask, face shield/goggles, gloves and a gown."[27]  On April 6, in response to revised CDC guidance on April 3 advising that face coverings be worn in public settings where social distancing measures are difficult to maintain, the BOP directed institutions to "[issue] surgical masks as an interim measure to immediately implement CDC guidance, given the close contact environment of correctional institutions."[28]  We found that FCC Lompoc complied with this directive and first issued surgical masks to all staff and inmates on April 6.[29]  However, this was 11 days after the hospitalization of a Lompoc inmate on March 26

---

[25] BOP, memorandum for All Chief Executive Officers, Coronavirus (COVID-19) Update–Use of Face Masks, April 6, 2020.

[26] The CDC defines PPE as "a variety of barriers used alone or in combination to protect mucous membranes, skin, and clothing from contact with infectious agents."  Depending on the situation, PPE may include gloves, surgical masks, N95 respirators, goggles, face shields, and gowns.  Cloth face coverings are intended to keep the wearer from spreading respiratory secretions when talking, sneezing, or coughing.  The CDC does not consider cloth face coverings to be PPE.

[27] BOP, memorandum for All Chief Executive Officers, Coronavirus (COVID-19) Phase Two Action Plan Update Number 1, March 18, 2020, 3.  Initially, on March 13, the BOP issued guidance that employees screening staff for COVID-19 wear an N95 respirator.  For more information, see BOP, memorandum for All Chief Executive Officers, March 13, 2020, 3.

[28] BOP, memorandum for All Chief Executive Officers, April 6, 2020, 1–2.  The guidance indicated that the BOP would be distributing to institutions cloth face coverings, which would replace the use of surgical masks at that time.  For more information, see CDC, "Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission," April 3, 2020, www.cdc.gov/coronavirus/ 2019-ncov/prevent-getting-sick/cloth-face-cover.html (accessed July 15, 2020).

[29] Acting Complex Warden, memoranda for FCC Lompoc Staff and Inmate Population, Face Masks, April 6, 2020, 1.

On April 13, the BOP issued nationwide guidance directing that "all staff and inmates will be issued and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved."  BOP, memorandum for All Chief Executive Officers, Coronavirus (COVID-19) Phase Six Action Plan, April 13, 2020, 4.

with COVID-19 symptoms and 10 days after the first institution staff member tested positive for the virus on March 27.[30]

We asked BOP and Lompoc officials whether there were additional, proactive steps Lompoc officials could have taken regarding PPE to mitigate the emerging threat. BOP and Lompoc officials told us that Lompoc followed CDC recommendations regarding the use of PPE and that until April 3, when the CDC reported that asymptomatic individuals could spread the virus, there were no expert recommendations to distribute face coverings to all staff and inmates. Further, the BOP stated that proactively distributing face masks, which was not a proven, evidence-based strategy at a time when PPE resources were limited, would not have been appropriate. While BOP officials told us that issuing face masks would have been inappropriate, they also acknowledged that in hindsight inmates and staff not wearing face masks at this time probably contributed greatly to COVID-19 spread across FCC Lompoc.

In addition, although Lompoc officials maintained that the institution had sufficient levels of PPE at the time of our inspection, 70 percent (76 of 109) of Lompoc staff who responded to our survey indicated that more PPE for staff was an immediate need and 46 percent (50 of 109) of Lompoc staff who responded to our survey reported that inmates needed more PPE as well. Most commonly, Lompoc staff reported that the institution needed to provide staff with additional N95 respirators to adequately safeguard them from contracting the virus, particularly considering the widespread outbreak across the institution. Further, at the time of our inspection, a Lompoc staff member told us that not all correctional staff had been provided with eye protection, which had been a required item of PPE only for staff performing COVID-19 screenings or working in quarantine and medical isolation units.[31] Another Lompoc staff member responded to our survey that staff had been instructed to return and share eye protection with other staff, which the CDC

---

[30] According to FCC Lompoc officials, institution staff members received cloth face coverings on April 10 and inmates received cloth face coverings by April 14. However, a local union official expressed to the OIG concern about the quality of the cloth face coverings, comparing the material to burlap and stating that N95 respirators prevent 95 percent of containments whereas he believed that staff members' cloth face coverings were much less effective. Several Lompoc staff responding to the OIG's survey echoed these concerns and raised doubts that the cloth face coverings would adequately safeguard staff from contracting the virus.

[31] In response to the working draft of this report, BOP and Lompoc officials stated that there was never a shortage of PPE at Lompoc and that staff members who had a clinical need for N95 respirators were provided with them in accordance with CDC guidelines. The BOP also noted that PPE was recommended only for personnel conducting staff screenings and staff members working in the quarantine and isolation units.

Quarantine is used to keep someone who might have been exposed to COVID-19 away from others for 14 days to help prevent the spread of disease and determine whether the person develops symptoms. In a correctional setting, the CDC recommends, ideally, quarantining individuals in a single cell with solid walls and a solid door that closes. If symptoms develop during the 14-day period, the person should be placed in medical isolation and evaluated for COVID-19. See CDC, "Interim Guidance."

has warned can increase the risk for transmission if the eye protection is not properly disinfected.[32]

## Lack of Permanent Leadership and Communications Protocols

We found that one additional factor that may have contributed to the challenges facing FCC Lompoc in responding to the spread of COVID-19 was that the institution had several key leadership vacancies across the complex and did not have communications protocols in place to fully inform staff about the spread of the virus. A Lieutenant, who had served as an acting Deputy Captain during the outbreak, told the OIG that having permanent, "seasoned leadership" at the onset of the outbreak would have benefited the complex's COVID-19 response. Further, a Lompoc staff member commented through the OIG's survey that USP Lompoc "had an acting Warden and no Captains, which likely led to [a] lack of decision making and action" and that "it was not until the [acting] Complex Warden from Tucson arrived [on March 31] that staff began to receive information and guidance." We observed that FCC Lompoc had been led by three different officials serving as the acting Complex Warden since the onset of the institution's outbreak and more than half (9 of 14) of the Lompoc management officials we interviewed were TDY staff or institution staff who had operated in an acting capacity since March.[33] In response to the working draft of this report, the BOP stated that an acting Warden was selected to oversee operations when the Complex Warden position became vacant on January 19, 2020. Further, the BOP stated that there was no lack of leadership because each official who had served as the acting complex Warden until the position was filled on June 7 had over 20 years of correctional experience.

In addition, a union official reported to us that during the early stages of the outbreak the institution did not inform staff members that they had been in close contact with a colleague who had tested positive for COVID-19. This failure to inform staff members of their contact with an infected person meant that BOP staff who had possibly been exposed to the virus—and therefore could themselves have been infected—were potentially exposing colleagues, inmates, and family members. The union official told us that the BOP has since addressed this issue and now informs staff members of potential exposure in a way that ensures employees' medical privacy.[34] In response to the working draft, Lompoc officials reported that they took significant measures to protect the safety and security of all staff, inmates, and members of the public during the

---

[32] CDC, "Eye Safety," July 29, 2013, www.cdc.gov/niosh/topics/eye/eye-infectious.html (accessed July 15, 2020).

In response to the working draft of this report, Lompoc officials stated that they instructed staff working in the quarantine and isolation units who used goggles and faces shields on how to properly sanitize this equipment and set up a sanitation station at entry points to these units.

[33] In April 2020, TDY staff assumed the Complex Warden, FCI Warden, FCI Deputy Captain, Operations Lieutenant, and two Associate Warden positions. The Deputy Case Management Coordinator position had been assumed by institution staff operating in an acting capacity. On June 7, a new permanent Complex Warden was designated to FCC Lompoc.

[34] To comply with Occupational Safety and Health Administration communication requirements, on April 8 the BOP provided all institutions with a "COVID-19 Notice to Staff" template letter for informing staff who may have been exposed to an individual who had tested positive for COVID-19.

COVID-19 pandemic. Specifically, the BOP stated that the leadership team provided information on a regular basis to all staff, department heads, and specific subject matter experts, in addition to continuous updates and guidance beginning with the BOP's Phase 1 guidance dated January 31, 2020. Though Lompoc officials provided many examples of guidance sent to Lompoc staff prior to the institution's COVID-19 outbreak in late March, we did not receive documentation of guidance addressing the need to inform staff members who had possibly been exposed to the virus because of their contact with an infected person.

## Conditions of Confinement, Visitation, Commissary, and Hygiene Products

We found that FCC Lompoc took several steps to modify institutional operations to increase social distancing in accordance with guidance issued by the BOP in March 2020. Specifically, on March 13 the institution suspended inmate social and legal visits in accordance with BOP-wide guidance.[35] Then, on April 1, FCC Lompoc advised inmates that the institution was restricting the movement of all inmates and was implementing a "Stay in Place" restriction to stop the spread of the virus.[36] During this time, inmates were allowed out of their cells only in small groups at designated times, on a limited basis, to access medical care, showers, phones, and email terminals.

By April 20, FCC Lompoc escalated its restrictions through a lockdown (for health-related purposes rather than security-related reasons) across all Lompoc facilities. This escalation suspended some inmates' access to showers, telephones, computer terminals, and commissary.[37] Lompoc officials told us that they implemented these additional restrictions because they believed them to be necessary to control the spread of COVID-19. The officials told us that they initially allowed inmates to shower in smaller groups; but, because COVID-19 cases continued to rise across the complex, they determined that more aggressive mitigation was necessary.

---

[35] On March 13, the BOP directed institutions to suspend all social and legal visits for 30 days, which was subsequently extended through at least July 31. The BOP guidance permitted institutions to accommodate case-by-case requests for legal visits. Further, the guidance stated that institutions should offer video conferencing as an alternative to in-person legal visits. BOP, memorandum for All Chief Executive Officers, March 13, 2020, 1–2.

[36] The BOP enacted a "14-day nationwide action to minimize movement to decrease the spread" of COVID-19 in its Phase Five Action Plan on April 1 and extended this action in its Phase Six and Phase Seven Action Plans. Some institutions chose to describe this action as a "Shelter in Place," "Stay in Place," or "Stay in Shelter." In announcing this action, the BOP noted that its "actions are based on health concerns, not inmate destructive behavior." See Appendix 3 for a timeline of the BOP's guidance to its institutions.

FCC Lompoc, Talking Points Town Hall, Advisory to the Inmate Population/COVID-19, April 1, 2020, 1.

[37] During the lockdown, approximately 1,000 USP inmates did not have access to showers. On May 8, Lompoc officials reported that the USP had relaxed its restrictions and initiated "very small, slow, controlled movements to allow inmates access to showers, emails, and telephones with social distancing and disinfecting protocols being followed." Though officials first indicated that the FCI lockdown had been extended to at least May 18, Lompoc reported to the OIG in June that FCI Lompoc lifted its enhanced mitigation measures in May after it had tested all FCI inmates. As of June 24, all FCC Lompoc facilities had implemented inmate movement restrictions consistent with Phase Seven of the BOP's national action plan (see Appendix 3).

In addition, the acting FCI Warden stated that the FCI suspended its commissary operation during the lockdown because the design of the institution was not conducive to social distancing.[38] Further, inmates were prohibited from accessing the law library to work on their legal cases. Correctional officials told us that inmates were still permitted to communicate with their legal representatives through special legal mail and that staff members could authorize legal phone calls for urgent matters.  Lastly, during the lockdown, inmates were confined to their cells for 24 hours a day without recreation, which is more restrictive than conventional Special Housing Unit (SHU) placement.  The OIG has found that such restrictions can raise significant mental health issues, and we asked Lompoc officials whether they took any steps to mitigate those potential concerns.[39]  BOP officials responded that, consistent with standard BOP restrictive housing unit practices, Staff Psychologists conducted frequent rounds in all housing units and provided individual counseling to inmates on an as-needed basis.  Additionally, psychology staff coordinated with other institution staff, such as Health Services staff, to ensure that inmates' mental health concerns were appropriately addressed and correctional staff provided inmates with self-help programming, reading materials, and other in-cell activities.

We were told that, to address inmates' hygienic needs, staff members provided inmates with multiple hygiene kits that contained a razor, a toothbrush, toothpaste, and soap bars so inmates could wash themselves at the sink in their cell.  Despite these kits, 36 percent (39 of 109) of Lompoc staff who responded to our survey reported that more personal hygiene supplies, including soap and hand sanitizers, was an immediate need for inmates.  With regard to hygienic supplies for staff, a Lompoc manager told us that the institution maintained adequate supplies and indicated that there were hand sanitizer stations for staff on every unit and in other locations throughout the institution.  Further, he indicated that staff restrooms were well stocked with soap and paper towels and that staff could obtain new hand sanitizer bottles each day when they were screened.  However, 55 percent (60 of 109) of Lompoc staff who responded to our survey reported that more hygiene supplies for staff was an immediate need, although only 1 of the survey respondents provided specific comments about the nature of their hygiene concerns.

We observed that, despite FCC Lompoc's efforts, its infrastructure may have limited its ability to implement the CDC's social distancing guidelines.  FCC Lompoc has open bar cells (as opposed to solid doors), and inmates congregate in common areas, which can facilitate rapid community spread.  Infrastructure issues are particularly concerning at the FCI, where inmates are housed open, dormitory style, with bunk beds 3 feet apart from each other (see the photograph below).[40]

---

[38] The BOP did not direct institutions to suspend commissary privileges.

[39] The OIG's 2017 restrictive housing report identified recent studies that suggested that the frequency, duration, and conditions of confinement of restrictive housing, even for short periods of time, can cause psychological harm and significant adverse effects on inmates' mental health.  For more information, see DOJ OIG, *The Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness*, E&I Report 17-05 (July 2017), www.oig.justice.gov/sites/default/ files/reports/e1705.pdf.

[40] The CDC advised that people stay at least 6 feet apart.  For more information, see CDC, "Social Distancing," www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (accessed July 15, 2020).

Based on our review of BOP documents, FCC Lompoc Executive Staff reported the infrastructure concerns to the Office of the Attorney General on April 16. FCC Lompoc subsequently alleviated some of the issues by setting up cots for inmates in the FCI's gym and a closed UNICOR factory.[41] Further, in response to the formal draft of this report, the BOP stated that Lompoc officials added a total of 252 beds in non-housing locations such as the chapel, the visiting room, tents, and in a Residential Drug Abuse Program space, in



FCI Lompoc Housing Unit
**Source:** BOP, with OIG enhancement

addition to the locations already mentioned. Still, social distancing issues remained at the FCI and, by May 11, the BOP reported that about 77 percent (891 of 1,162) of all FCI inmates had tested positive for COVID-19 and were considered active cases.

## Quarantine Procedures

We found that FCC Lompoc complied with BOP directives by taking steps to quarantine inmates to mitigate COVID-19 transmission.[42] According to Lompoc officials, the institution first established a quarantine and isolation unit on a range in the USP's SHU to house the last transfer of incoming inmates. Correctional officials indicated that the quarantine unit was then relocated to an unused USP Lompoc housing unit (H-Unit) on March 27, while the isolation unit remained on the SHU range at that time. On April 2, Lompoc officials relocated the isolation unit to the H-Unit to accommodate the rise in COVID-19 cases across the complex and the quarantine unit was moved to the USP's M-Unit (see the photograph below). At the time of our inspection, the BOP's Infection Prevention and Control Coordinator told us that institution staff had placed the last transfer of incoming inmates into quarantine in the USP Lompoc's M-Unit. FCC Lompoc Executive Staff stated that the only new inmates on the compound in April were 18 voluntary surrenders to the institution (which FCC Lompoc cannot control), all of whom were designated to the M-Unit for

---

[41] Federal Prison Industries, called UNICOR, is a government corporation within the BOP that provides employment to inmates at federal prisons throughout the United States.

[42] BOP, memoranda for All Chief Executive Officers, March 13, 2020, 3, and April 13, 2020, 3–4.

quarantine.[43]  Consistent with Lompoc officials' statements, the OIG survey results indicate that the institution followed a minimum 2-week quarantine for incoming inmates and medical isolation for inmates exhibiting COVID-19 symptoms.  However, 50 percent (55 of 109) of Lompoc staff who responded to our survey reported that the institution needed additional space to successfully continue to quarantine inmates and only 31 percent (32 of 104) of Lompoc staff who responded to our survey indicated that inmates who had been in close contact with a symptomatic inmate were quarantined for 14 days.

## Use of Home Confinement and Compassionate Release Authorities

In response to the COVID-19 pandemic, the Attorney General authorized the BOP, consistent with pandemic-related legislation enacted in late March 2020, to reduce the federal prison population by transferring inmates from prison to home confinement.[44]  In an April 3 memorandum, the Attorney General also directed the BOP to "immediately maximize appropriate transfers to home confinement of all appropriate inmates" at



At the time of our inspection, FCC Lompoc used the H-Unit to medically isolate inmates suspected of having contracted COVID-19 or those who had tested positive for the virus.

**Source:**  BOP, with OIG enhancement

those prisons "where COVID-19 is materially affecting operations."[45]  The BOP assigned to its Central Office the responsibility for developing guidance implementing the Attorney General's directives and initially identifying inmates who would be considered for possible transfer to home confinement.

Over the next 5 weeks, the BOP Central Office issued three guidance memoranda and sought to assist institutions in identifying eligible inmates by providing them with rosters of inmates that the Central Office determined might be eligible for transfer pursuant to the BOP's guidance.  The Central Office's initial policy guidance in early April was focused on transferring to home

---

[43]  The term "voluntary surrender" refers to an inmate reporting to a BOP institution of his or her own volition after a federal court orders the inmate to do so, rather than being transported there by law enforcement officials.

[44]  Home confinement, also known as home detention, is a custody option whereby inmates serve a portion of their sentence at home while being monitored.

[45]  William P. Barr, Attorney General, memorandum for Director of Bureau of Prisons, Increasing Use of Home Confinement at Institutions Most Affected by COVID-19, April 3, 2020, www.justice.gov/file/1266661/download (accessed July 15, 2020), 1.

confinement those inmates who faced the greatest risks from COVID-19 infection, including elderly inmates. In late April, the BOP began to expand its use of home confinement to cover inmates other than those who were elderly or at high risk for serious illness due to COVID-19, as determined by CDC guidance. In addition, the BOP allowed institution Wardens to identify inmates otherwise ineligible for home confinement under Central Office guidance criteria and to seek approval from the Central Office to transfer those inmates to home confinement.

During the period from April 4 to May 15, the BOP Central Office sent FCC Lompoc 9 rosters, identifying 509 inmates in total, who the Central Office determined were potentially eligible for transfer to home confinement. We found that Lompoc officials followed Central Office guidance that required Lompoc to review its inmates (including but not limited to those on the rosters), by examining each inmate's criminal history and risk of recidivism, conduct in prison, health conditions, and home release plan, to determine whether the inmate met the BOP criteria for transfer to home confinement. This review process, coupled with a 14-day prerelease quarantine period the BOP required to ensure that inmates placed into the community did not have COVID-19, resulted in 3 or more weeks between the time the Central Office identified an inmate for transfer consideration to the date the inmate was actually transferred to home confinement. As a result, we found that in April FCC Lompoc's ability to use home confinement in response to the spread of COVID-19, as a mechanism to reduce either the at-risk inmate population or the overall prison population and facilitate social distancing, was extremely limited. Indeed, as of May 13, over 900 Lompoc inmates had contracted COVID-19 and we determined that only 8 inmates had been transferred to home confinement in accordance with the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) authorities and BOP guidance.

## Attorney General and BOP Memoranda Regarding the Use of Home Confinement

On March 26, the Attorney General directed the BOP to prioritize the use of home confinement as a tool to combat the dangers that COVID-19 posed to "at-risk inmates who are non-violent and pose minimal likelihood of recidivism."[46] At the time, the BOP had the authority to transfer an inmate to home confinement for the final months of his or her sentence, subject to the following statutory limitations: (1) for any inmate, the shorter of 10 percent of the term of imprisonment or 6 months; (2) for an inmate age 60 or older, up to one-third of his or her sentence, if he or she met certain additional criteria; and (3) for a terminally ill inmate, any period of time, if he or she met certain additional criteria.[47] The Attorney General's memorandum identified a "non-exhaustive"

---

[46] William P. Barr, Attorney General, memorandum for Director of Bureau of Prisons, Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic, March 26, 2020, www.justice.gov/file/1262731/ download (accessed July 15, 2020).

[47] 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541(g)(5)(A). Additionally, federal law allows the BOP Director to seek court approval to modify an inmate's sentence of imprisonment for "extraordinary and compelling reasons," which is commonly referred to as "compassionate release" (18 U.S.C. § 3582(c)). As we describe below, following the issuance of the Attorney General's April 3 memorandum the BOP Director did not need to seek judicial approval under § 3582(c) if he determined that an inmate should be transferred to home confinement.

list of factors that the BOP should consider in determining whether to transfer an inmate to home confinement. Those factors included:

- the age and vulnerability of the inmate to COVID-19, based on CDC guidelines;
- the security level of the institution where the inmate was currently housed, with priority given to those in low and minimum security facilities;
- the inmate's disciplinary history, with inmates who engaged in violent or gang-related activity in prison, or who incurred a BOP violation during the prior 12 months, not receiving priority treatment;
- the inmate's Prisoner Assessment Tool Targeting Estimated Risk and Needs (PATTERN) score, with inmates exceeding a minimum score not receiving priority treatment;[48]
- whether the inmate had a verifiable reentry plan "that will prevent recidivism and maximize public safety;" and
- the inmate's crime of conviction.

The memorandum further required an assessment by the BOP Medical Director, or designee, of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 infection at the inmate's prison facility, and the risks of COVID-19 infection at the planned home confinement location.

The following day, on March 27, the President signed into law the CARES Act, which authorized the BOP Director to lengthen the maximum amount of time that an inmate may be placed in home confinement "if the Attorney General finds that emergency conditions will materially affect the functioning of the [BOP]."[49] The following week, on April 3, the Attorney General issued a memorandum, entitled "Increasing Use of Home Confinement at Institutions Most Affected by COVID-19," which found, as provided for in the CARES Act, "that emergency conditions are materially affecting the functioning of the [BOP]."[50] As a result of that finding, the BOP Director was authorized by the CARES Act to increase the amount of time that inmates could be placed in home confinement. The memorandum instructed the BOP to "immediately maximize appropriate transfers to home confinement of all appropriate inmates" at those prisons "where COVID-19 is

---

[48] To assess inmates' recidivism risk, the BOP uses the PATTERN system, which the Department developed in response to the FIRST STEP Act of 2018. The FIRST STEP Act directed the Department to complete its initial risk and needs assessment for each federal inmate by January 15, 2020. Among other things, PATTERN calculated inmates' recidivism risk using a point system that classifies inmates into either minimum, low, medium, or high risk categories based on: (1) infraction convictions during current incarceration, (2) number of programs completed, (3) work programming, (4) drug treatment while incarcerated, (5) noncompliance with financial responsibility, (6) history of violence, (7) history of escapes, (8) education score, (9) age at time of the assessment, (10) instant violent offense, (11) history of sex offense, and (12) criminal history score. For more information, see Office of the Attorney General, *The First Step Act of 2018: Risk and Needs Assessment System–Update* (January 2020), www.nij.ojp.gov/sites/g/files/xyckuh171/files/media/document/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf (accessed July 15, 2020).

[49] Pub. L. No. 116-136.

[50] Barr, memorandum for Director of Bureau of Prisons, April 3, 2020.

materially affecting operations." In assessing inmates for transfer to home confinement, the memorandum stated that the BOP should be "guided by the factors in my March 26 Memorandum, understanding, though, that inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations."

In response to the Attorney General's memoranda, the BOP issued three policy memoranda, on April 3, April 22, and May 8, 2020. The BOP's April 3 memorandum provided institutions with "sample rosters...to aid in the identification of inmates who may be eligible for home confinement" and stated that eligible inmates "must be reviewed utilizing [the BOP's] Elderly Offender Home Confinement Program criteria and the discretionary factors listed in the [Attorney General's March 26 memorandum]."[51] As mentioned above, among the discretionary factors were an inmate's age and vulnerability to COVID-19, based on CDC guidelines, which include people 65 years and older and people of all ages with underlying medical conditions.[52] The April 3 memorandum also stated that inmates were required to have "maintained clear conduct for the past 12 months to be eligible." It further provided that pregnant inmates should be considered for placement in home confinement or an available community program.

The BOP's April 22 memorandum expanded the number of inmates eligible for consideration for transfer to home confinement, as authorized by the Attorney General's April 3 finding pursuant to the CARES Act.[53] Specifically, the memorandum stated that the BOP was prioritizing for home confinement consideration those inmates who either (1) had served 50 percent or more for their sentence or (2) had 18 months or less remaining on their sentence and had served 25 percent or more. In assessing whether inmates who met the expanded prioritization criteria were candidates for home confinement, the memorandum continued to apply the criteria from the Attorney General's March 26 memorandum. Additionally, the memorandum continued to provide that pregnant inmates should be considered for placement in home confinement or an available community program. Finally, the BOP's memorandum allowed a Warden to seek approval from the BOP Central Office to transfer to home confinement an inmate who did not meet the memorandum's criteria if the Warden determined that transfer was necessary "due to [COVID-19] risk factors, or as a population management strategy during the pandemic." We note, however, that the April 22 memorandum did not specifically address the instruction in the Attorney

---

[51] The criteria in the BOP's Elderly Offender Home Confinement Program generally mirror those found in § 603 of the FIRST STEP Act, 34 U.S.C. § 60541 and require an inmate to, among other things, be at least 60 years old, have served at least two-thirds of his or her prison sentence, and not have been convicted of a crime of violence or sex offense.

[52] CDC guidelines state that people with chronic lung disease, moderate to severe asthma, serious heart conditions, severe obesity, diabetes, chronic kidney disease, and liver disease, particularly if not well controlled, are at high risk for severe illness from COVID-19. The guidelines also identify people who are immunocompromised as being at risk. The guidelines state that many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications. CDC, "People Who Are at Increased Risk for Severe Illness," www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (accessed July 15, 2020).

[53] The BOP's April 22 memorandum rescinded its April 3 memorandum.

32

General's April 3 memorandum that the BOP "immediately maximize appropriate transfers to home confinement" at those institutions "where COVID-19 is materially affecting operations," and "that inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations."

The BOP's third memorandum, issued May 8, was generally consistent with its April 22 memorandum, with one specific difference.[54]  The May 8 memorandum permitted inmates to be considered for transfer to home confinement despite having committed certain misconduct in prison during the prior 12 months if, in the Warden's judgment, home confinement "does not create an undue risk to the community."  The May 8 memorandum, like the April 22 memorandum, did not specifically address the Attorney General's instruction that the BOP "immediately maximize appropriate transfers to home confinement" at institutions most affected by COVID-19, nor did it specify that inmates at such institutions "with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention."

## OIG Estimate of Lompoc Inmates Potentially Eligible for Home Confinement Consideration Based on BOP Guidance and Available Authorities

In order to independently assess the number of FCC Lompoc inmates potentially eligible for transfer to home confinement applying the authorities described above and the BOP guidance criteria, the OIG's ODA used data from the BOP's inmate management system, SENTRY.  That data did not allow the ODA to replicate every criterion used by the BOP to determine home confinement eligibility; as a result, in some instances the ODA used certain proxies.  For example, in applying the public safety criteria in the BOP guidance, the ODA considered all inmates at a minimum or low security level as potentially eligible for home confinement, whereas the BOP considered certain additional public safety factors that may have limited the eligibility of some of those inmates for home confinement consideration.  Separately, in estimating the number of inmates who were eligible for transfer to home confinement under 18 U.S.C. § 3624(c)(2) prior to enactment of the CARES Act, the ODA included only those inmates in minimum or low security facilities with 6 months or less remaining, although the statute applies to all inmates regardless of the security level of the institution where they are incarcerated but limits placement into home confinement to no more than 10 percent of an inmate's sentence.[55]  Further, in determining the number of inmates who were at high risk of severe illness from COVID-19 and therefore were eligible for home confinement consideration under BOP guidance, the ODA included inmates aged 65 or older only.  Determinations about whether specific underlying medical conditions for inmates under age 65 placed them in a high risk category or made them appropriate for transfer

---

[54] The BOP's May 8 memorandum rescinded its April 22 memorandum.

[55] 18 U.S.C. § 3624(c)(2) states that "the authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months.  The [BOP] shall, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the maximum amount of time permitted under this paragraph."

were made by the institution based on a case file review, which the OIG did not undertake in connection with our remote inspection.[56]

Based on the available data, the ODA estimated that, as of April 12, approximately 957 of the 1,775 inmates in Lompoc's low and minimum security facilities were potentially eligible for home confinement under existing authorities and BOP guidance.  By comparison, as detailed above, the BOP Central Office included 509 inmates in the 9 rosters it provided to FCC Lompoc for home confinement consideration between April 4 and May 15.[57]  The table below details the ODA's estimated number of inmates eligible for transfer by available authority or BOP guidance factor.

Table

OIG Estimate of the Number of Lompoc Inmates Eligible for Transfer to Home Confinement Based on BOP Guidance and Available Authorities

| Authority | 18 U.S.C. § 3624(c)(2) Prior to the CARES Act | FIRST STEP Act: Pilot Program for Elderly, Nonviolent Offenders | Post-CARES Act and the Attorney General's April 3 Finding:  BOP Implementing Guidance | |
|---|---|---|---|---|
| Inmate Population | Inmates in low and minimum facilities with a remaining sentence of 6 months or less | Inmates in low and minimum facilities at least 60 years of age and having served at least two-thirds of their sentence | Inmates in low and minimum facilities and at least 65 years of age (i.e., at high risk according to the CDC) | Inmates in low and minimum facilities, under the age of 65, and having served at least 50 percent of sentence or at least 25 percent with 18 months or less remaining |
| Number of Inmates as of April 12, 2020 | 115 | 50 | 84 | 708 |

Notes:  Some inmates may have been eligible for transfer under multiple authorities, but the table counts each inmate only once.  If eligible under multiple authorities, the inmate would be counted under the first authority for which he was eligible, moving from left to right.

**Sources:**  18 U.S.C. § 3624(c)(2); 34 U.S.C. § 60541(g); CARES Act, Pub. L. No. 116-136; and OIG data analysis

---

[56] According to the BOP's Administrator of Reentry Services, different institutions may have different interpretations of how severe a medical condition deemed by the CDC as high risk must be for the inmate to be considered eligible for home confinement.  As noted below, Health Services staff evaluated whether an inmate's medical needs could still be met if the inmate was placed into the community.

[57] Our review of the BOP's 9 rosters shows that the 509 Lompoc inmates included 354 previously designated low risk inmates on the BOP's May 8 roster (Roster 7), whom Lompoc staff had to rescore using the BOP's new PATTERN Risk Scoring Form (rev. January 2020).  According to BOP guidance, Lompoc inmates who were classified as minimum risk under the new PATTERN Risk Scoring Form were then reassessed by the Central Office to determine their potential eligibility for home confinement placement.  As we noted above, the OIG's ODA used data from the BOP's inmate management system, SENTRY, to assess the universe of potentially eligible Lompoc inmates.  The ODA did not have data to replicate all of the criteria that the BOP used to determine home confinement eligibility, which included the BOP's PATTERN risk data.

## FCC Lompoc's Use of Home Confinement

To facilitate institutions' implementation of the Attorney General's directives, the BOP Central Office created and disseminated to institutions a series of rosters applying the factors identified in the criteria from the BOP memoranda. FCC Lompoc received nine different rosters from the Central Office between April 4 and May 15, and BOP officials stated that multiple rosters were provided because each successive BOP memorandum expanded the inmate eligibility criteria. Lompoc's rosters identified 509 inmates who were potentially eligible for transfer to home confinement.

Upon receipt of each roster, FCC Lompoc's Unit Team, Health Services, and Special Investigative Supervisor staff reviewed the case files for each inmate to assess whether the inmate should be considered for transfer to home confinement based on the factors identified in the BOP's current memorandum. According to a BOP Assistant Director, who served as Lompoc's acting Complex Warden from May 6 to June 5, the BOP redirected staff at the local, regional, and community confinement levels and dedicated staff full-time at the institution level to review inmates' case files to determine their eligibility and confirm release plans. As a result, he indicated that the BOP had reduced the duration of its normal release process from 2–3 months to a couple of weeks.

As part of FCC Lompoc's efforts to evaluate the rosters of inmates identified by the BOP Central Office as potentially eligible for home confinement, institution staff conducted a public safety determination. Lompoc's acting Deputy Case Management Coordinator told us that the Unit Team staff assessed whether each inmate had any disqualifying public safety factors and Special Investigative Supervisor staff determined whether the inmate had gang affiliations or otherwise presented a risk to public safety. In addition, Health Services staff evaluated whether the inmate's medical needs could still be met if he was placed in home confinement.

A Lompoc official told the OIG that by May 13 the institution had determined that approximately 150 inmates identified by the BOP Central Office were eligible to be transferred to home confinement or an RRC pursuant to the criteria in the Attorney General's and BOP's memoranda; however, by that date, only 9 of those inmates had been placed into home confinement or an RRC under the CARES Act.[58] We were also told that during this time Lompoc continued to process for transfer into an RRC or home confinement inmates who were qualified to leave prison under authorities that existed prior to the CARES Act and that between March 26 and May 13 Lompoc transferred 25 inmates out of the institution through its routine reentry process.

Lompoc reported to the OIG that by June 24 the number of its inmates who had been placed into home confinement or an RRC since March 26 had increased from 34 to 124. Lompoc data indicated that 38 of these inmates had been placed into home confinement while 86 of them had

---

[58] We spoke to this official 2 days before Lompoc received its ninth and most recent roster of potentially eligible inmates, which included 16 inmates who were over the age of 65. In June, this official told us that Lompoc had since determined that as of June 5 at least 216 inmates had been deemed eligible under the Attorney General's home confinement directive.

been placed into an RRC; however, a Lompoc official told us that the institution could not always tell whether inmates placed directly into an RRC were there only temporarily before transferring to home confinement.[59] In June, Lompoc also reported that it had referred an additional 14 inmates with age risk factors to the BOP Central Office for home confinement consideration under the provision of the BOP's April 22 and May 8 memoranda that allowed Wardens to refer inmates who did not meet either the 50 percent or 25 percent criteria or the public safety factors.[60] Documentation we reviewed indicated that the BOP had approved 1 of the 14 inmates for transfer to home confinement or an RRC.

We asked the then acting Complex Warden why, as of May 13, only 34 Lompoc inmates had been moved out of prison, given the impact of the COVID-19 pandemic that the facility began to experience in late March. He explained that the institution cannot move an eligible inmate to home confinement or an RRC until the local RRC that will be assuming responsibility for monitoring the inmate, whether in home confinement or an RRC, has confirmed that it is able to do so.[61] He added that during the COVID-19 pandemic this has sometimes delayed releasing eligible inmates to home confinement or an RRC. He stated that some RRCs are short staffed, which presents significant challenges given the increased number of inmates throughout the country whom the BOP has transferred into RRC supervision at RRC facilities and in home confinement.[62] We learned from another Lompoc official that COVID-19 outbreaks in two RRCs delayed two Lompoc inmates from transferring to them. We also learned that additional factors affected BOP institutions' ability to move eligible inmates out of prison, including the role of the U.S. Probation Office in approving relocations, the need for a suitable home address, and an inmate's ability to receive healthcare in the community.

---

[59] In comparison, we were advised that between December 2019 and February 2020 Lompoc did not place any inmates into home confinement but placed 151 inmates into RRCs.

A 2016 OIG audit report found that the BOP could more strategically identify inmates suitable for placement directly into home confinement and that the BOP had underutilized home confinement placement as an alternative to RRC placement for transitioning low risk, low need inmates back into society despite BOP policy and guidance stating that direct home confinement placement was preferred for such inmates. See DOJ OIG, *Audit of the Federal Bureau of Prisons' Management of Inmate Placements in Residential Reentry Centers and Home Confinement*, Audit Report 17-01 (November 2016), www.oversight.gov/sites/default/files/oig-reports/a1701.pdf.

[60] On June 23, the BOP's Residential Reentry Services Branch Administrator told the OIG that the Home Confinement Review Committee's records indicated that Lompoc had referred only four inmates to the committee for a home confinement suitability review, with the first inmate being referred on June 17.

[61] Inmates transferred from a BOP institution to home confinement prior to the conclusion of their prison sentence remain subject to BOP monitoring while under home confinement. As a general matter, the BOP contracts with RRCs to monitor such inmates. According to the BOP's Residential Reentry Services Branch Administrator, RRC staff monitor more than 90 percent of the approximately 7,000 inmates who were placed into home confinement as of June 23.

[62] BOP officials stated that inmates were transferred to home confinement as soon as the necessary release preparation measures were completed, including verification of the inmate's home address and confirmation with family members that the inmate's release plan was viable and could be fulfilled in the home environment.

We asked Lompoc's then acting Complex Warden why Lompoc had determined that most of the 509 inmates referred by the BOP Central Office were ineligible for transfer to home confinement or an RRC. He told us that, while Lompoc viewed the Attorney General's directives as a way to reduce the inmate population to better facilitate social distancing within its facilities, the institution also had a responsibility to ensure that inmates who posed a risk to public safety were not released into the community. He noted that many inmates housed in low and minimum security facilities may appear to present minimal risk to the community based on their current institution security level, but that some have criminal histories including violence and sex offenses that preclude them from home confinement placement. He further explained that inmates initially classified as high security can, over time, work their way down to low or minimum security designations through good institutional conduct. As a result, the institution had to review the case file for each potentially eligible inmate and could not make generalized determinations of eligibility.

The OIG recognizes and appreciates the importance of the public safety considerations associated with the potential release of a BOP inmate and the challenges that BOP officials face in determining whether to transfer an inmate to home confinement. These are difficult, risk-based decisions. However, we also note that in early April, at a time when Lompoc was facing a growing COVID-19 outbreak, the BOP had been given authority to expand existing release criteria and the Attorney General had directed the BOP to "immediately maximize appropriate transfers to home confinement of all appropriate inmates" at prisons, like Lompoc, "where COVID-19 is materially affecting operations." Despite this admonition, the data does not reflect that the BOP took immediate action at Lompoc. For example, as of April 12, approximately 115 low and minimum security Lompoc inmates had 6 months or less remaining in their sentence. Under the law, upon completion of an inmate's sentence, the BOP is obligated to release the inmate from prison. Therefore, these 115 low and minimum security inmates were going to be returning to their communities no later than early October, many likely much sooner. Moreover, nearly all of these inmates would have been eligible for immediate home confinement consideration under BOP guidance and existing law.[63] While we recognize that some of these low and minimum security inmates may not have been candidates of transfer to home confinement because they did not have a residence to go to, or due to their actions while incarcerated or prior criminal histories, we found that 87 percent (100 of 115) of these inmates remained at FCC Lompoc as of May 10, more than a month after the Attorney General's memorandum. By June 14, 38 percent (44 of 115) of these inmates continued to reside at Lompoc. As a result, we concluded that the BOP did not fully

---

[63] While 18 U.S.C. § 3624(c)(2) would normally have limited the maximum amount of time that such inmates could be placed in home confinement to 10 percent of their prison sentence, the BOP's post-CARES Act guidance eliminated the 10 percent restriction for inmates who had 18 months or less remaining to their sentence and had already served 25 percent of their sentence. This meant that any inmate who had less than 6 months remaining on an 8 month or longer sentence could immediately be considered for home confinement. According to the BOP, approximately 98 percent of defendants sentenced to a term of imprisonment have received a sentence of at least 1 year.

leverage its expanded authorities under the CARES Act and the Attorney General's memoranda to promptly transfer Lompoc inmates to home confinement.[64]

## Compassionate Release

Another means by which inmates can be moved from prison to home is through a reduction to their sentence pursuant to the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A)(i).[65] Under the statute, either the BOP or an inmate may request that a federal judge reduce the inmate's sentence for "extraordinary and compelling reasons," such as age, terminal illness, other physical or medical conditions, or family circumstances.  An inmate must first submit a compassionate release request to the BOP, but the inmate is permitted to file a motion directly with the court if the BOP denies the petition, or 30 days after the inmate files the petition with the BOP, whichever occurs first.

We were told that the BOP prioritized using the home confinement authorities described above, rather than the compassionate release statute, to respond to the COVID-19 pandemic because those authorities allowed the BOP to approve inmates for release whereas compassionate release requires the approval of a federal judge.  Officials in the BOP's Office of General Counsel told us that the COVID-19 pandemic has not changed the BOP's eligibility requirements for compassionate release.  Additionally, the Department has taken the position, in legal guidance when responding to compassionate release motions filed by inmates with courts, that the risk of COVID-19 by itself is not an "extraordinary and compelling" circumstance that should result in the grant of a compassionate release request.[66]  Thus, COVID-19 would not cause the BOP to support a petition for compassionate release that it would not have supported otherwise.

---

[64] As noted previously, a class action lawsuit on behalf of Lompoc inmates was filed in May 2020 in the U.S. District Court for the Central District of California concerning the BOP's response to the COVID-19 pandemic at FCC Lompoc.  On July 14, a U.S. District Court Judge approved a provisional class certification for Lompoc inmates over the age of 50 or with underlying health conditions.  The Judge's order states that "the evidence before the court demonstrates meaningful social distancing is not possible at Lompoc absent a reduction in the inmate population," and that "there is no evidence [BOP officials] prioritizing their use of statutory authority under the CARES Act to grant home confinement to Lompoc inmates in light of the pandemic, or giving due consideration to inmates' age or medical conditions in evaluating eligibility of home confinement."  The Judge ordered the BOP to, among other things, "make full and speedy use of the BOP's authority under the CARES Act and evaluate each class member's eligibility for home confinement." *See Torres et al.; Plaintiff-Petitioners, v. Milusnic et al.; Defendant-Respondents,* Case 2:20-cv-04450-CBM-PVC, July 14, 2020, www.prisonlaw.com/wp-content/uploads/2020/07/Lompoc-Order-re-PI-and-Class-Cert.pdf (accessed July 22, 2020).

[65] For more information about how the BOP manages its compassionate release program, see BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g), January 17, 2019.  In 2013, the OIG issued a report examining the BOP's compassionate release program.  The OIG found, at that time, that the program had been poorly managed and inconsistently implemented.  See DOJ OIG, *The Federal Bureau of Prisons' Compassionate Release Program,* E&I Report I-2013-006 (April 2013), www.oversight.gov/sites/default/files/oig-reports/e1306.pdf.

[66] Executive Office for United States Attorneys, "Compassionate Release Litigation Guidance," May 18, 2020.

As a result of the COVID-19 pandemic, FCC Lompoc reported that the institution has processed about 20 times the typical volume of compassionate release petitions from Lompoc inmates, from usually about 10 applications a month to 201 applications in April 2020 alone. A Lompoc official told us that the vast majority of inmates who applied for compassionate release during the COVID-19 pandemic did not appear to be eligible under the program's criteria. On May 27, Lompoc reported that 9 out of approximately 387 inmates who had applied for compassionate release since March 1 had been released and that by June 5 the BOP had agreed to file motions with the court for the compassionate release of 3 additional inmates.

To provide more insight into these issues, the OIG is reviewing and will report separately on the Department's and the BOP's use of early release authorities, especially home confinement, to manage the spread of COVID-19 within BOP facilities.

APPENDIX 1

# SCOPE AND METHODOLOGY OF THE INSPECTION

The OIG conducted this inspection in accordance with the Council of the Inspectors General on Integrity and Efficiency's *Quality Standards for Inspection and Evaluation* (January 2012). We conducted this inspection remotely because of CDC guidelines and DOJ policy on social distancing. This inspection included telephone interviews with Lompoc officials, review of documents produced by the BOP related to the BOP's and Lompoc's management of the COVID-19 pandemic, the results of an OIG survey issued to all BOP staff, and analysis of publicly available BOP and COVID-19 data. We also considered a complaint we received from a union official at FCC Lompoc and complaints reported to the OIG Hotline. The photographs included in the report were taken by Lompoc officials for the purpose of providing the Office of the Attorney General with information about Lompoc's response to COVID-19 and at the OIG's request for this inspection.

To understand staff concerns, impacts, and immediate needs related to COVID-19, we issued an anonymous electronic survey to all BOP government employees from April 21 through April 29, 2020. We invited these 38,651 employees to take the survey and received 10,735 responses, a 28 percent response rate. Institution staff represented 9,932 of the 10,735 responses (93 percent). We received 126 survey responses from Lompoc personnel, representing 30 percent of staff assigned to the institution.

We conducted telephone interviews with BOP and local union officials, a Chief Executive of the Lompoc Valley Medical Center, and the FCC Lompoc Case Management Coordinator, Clinical Director, Deputy Case Management Coordinator/Case Manager, Unit Manager, and three Lieutenants. We also conducted a group telephone interview with 11 FCC Lompoc, BOP regional, and Central Office officials. We did not interview inmates as part of our remote inspection of FCC Lompoc.

The main issues we assessed through our interviews and data requests were the institution's compliance with BOP directives and CDC guidance related to PPE; COVID-19 testing; medical response and capability; social distancing, quarantine, sanitation, supplies, and cleaning procedures; and conditions of confinement. We also assessed actions taken to reduce the inmate population through implementation of relevant authorities.

We reviewed CDC guidelines and BOP-wide guidance and procedures, as well as the FCC Lompoc Fit Test Staff Roster, Community Relations Board information, media statements, documentation of staff COVID-19 screenings, PPE guidance and inventory, Quarantine Checklist, and information and guidance provided to staff.

APPENDIX 2

# OIG COVID-19 SURVEY RESULTS FOR FCC LOMPOC

| Open Period: | Invitations Sent: | Overall Responses: | Lompoc Responses: |
|---|---|---|---|
| April 21–29, 2020 | 38,651 | 10,735 (of 38,716) | 126 (of 416) |

Lompoc Responses: Departments 114 (of 126 responses):

Correctional Services: 29% | Health Services: 11% | Facilities Management: 11% | All Other Departments: 49%

Which of the following are immediate needs for your institution during the COVID-19 pandemic? (Top 5 Responses)



Lompoc (N=109)
BOP-wide (N=8,153)

More PPE for staff — 70% / 68%
Additional staff to cover posts — 70% / 39%
More personal hygiene supplies for staff — 55% / 49%
More space to quarantine inmates — 50% / 23%
More PPE for inmates — 46% / 39%

*Note: Personal hygiene supplies are defined as soap and hand sanitizer.*

Which of the following statements best describes the current guidance you have received from facility leadership about what you should do if you have been exposed to COVID-19? (Top 2 Responses)



■ Lompoc (N=117)   ▦ BOP-wide (N=9,163)

I have been advised that I should continue to report to work unless I experience symptoms. — 53% / 45%

I have been given conflicting guidance on what I should do if I have been exposed to COVID-19. — 23% / 19%

How strongly do you agree with the following statements about the adequacy of the guidance you have received about what you should do if you have been exposed to COVID-19? (All Responses)

*Respondents rated each item on a 5-point scale, with "strongly disagree" worth 1 point and "strongly agree" worth 5 points. "Don't know" responses are excluded.*

| | Lompoc Rating | BOP-wide Rating |
|---|---|---|
| The guidance was timely. | 2.45 | 3.18 |
| The guidance was clear. | 2.46 | 2.97 |
| The guidance was comprehensive. | 2.44 | 3.03 |

How strongly do you agree with the following statements about the adequacy of the practices your institution is taking to mitigate the risk of spreading COVID-19?  (Top 3 and Bottom 3 Responses)

| *Respondents rated each item on a 5-point scale, with "strongly disagree" worth 1 point and "strongly agree" worth 5 points.  "Don't know" responses are excluded.* | Lompoc Rating (N=113) | BOP-wide Rating (N=8,978) |
|---|---|---|
| **Three Practices Rated Highest:** | | |
| Staff are given sufficient information about COVID-19 symptoms and preventive actions (hand washing, wearing masks). | 3.86 | 4.09 |
| Inmates diagnosed with, or showing symptoms of, COVID-19 are being sufficiently segregated from other inmates to mitigate the virus spreading. | 3.75 | 3.94 |
| Inmates are given sufficient information about COVID-19 symptoms; preventive actions (e.g., hand washing, wearing masks); and changes to their daily routines. | 3.58 | 4.10 |
| **Three Practices Rated Lowest:** | | |
| Inmates are provided with a sufficient supply of masks. | 2.90 | 3.44 |
| Staff are provided a sufficient supply of masks. | 2.67 | 3.13 |
| Inmates are provided a sufficient supply of hand sanitizer where sinks are not available. | 2.48 | 3.07 |

Please identify which, if any, of the following social distancing measures your institution is currently employing to increase the amount of space between staff and inmates.  (Top 5 Responses)

| | Lompoc Percent of Respondents (N=104) | BOP-wide Percent of Respondents (N=8,435) |
|---|---|---|
| **The amount of time that inmates are required to remain in their housing units each day has been increased.** | 51% | 59% |
| The number of inmates participating in a program or activity at one time has been reduced. | 24% | 42% |
| **Other (Please describe.)*** | 23% | 10% |
| I don't know. | 21% | 15% |
| **Daily schedules are adjusted so that only one housing unit at a time is allowed to enter common space (such as the inmate cafeteria, Health Services clinic, library, classrooms, chapel, work space, or recreation space).** | 20% | 44% |

*Note:  The majority of Lompoc respondents who answered "Other" reported that the lockdown implemented on April 20 was the institution's main social distancing strategy.*

Which of the following statements best describes the current guidance you have received from facility leadership about your use of personal protective equipment (PPE)? (Top 2 Responses)



Which of the following statements best describes the current approach to COVID-19 screening of existing inmates (temperature check, questioning about other symptoms) at your institution? (Top Response)



All inmates are screened for symptoms at least once a day.

■ Lompoc (N=108)   ▨ BOP-wide (N=8,731)

*Note: Thirty-six percent of respondents chose "I don't know." The remaining chose categories amounting to less than 9 percent each.*

Please identify which, if any, of the following COVID-19 measures for screening incoming and departing inmates (temperature check, questioning about other symptoms) your institution is currently taking. (Top 3 Responses)



■ Lompoc (N=109)   ▨ BOP-wide (N=8,729)

Please identify which, if any, of the following measures your institution is currently employing to manage inmates with COVID-19 symptoms.  (Top 3 Responses)



Symptomatic inmates are placed in medical isolation. — 84% / 64%

Symptomatic inmates are provided masks. — 49% / 38%

The movements of inmates outside their medical isolation area are kept to an absolute minimum. — 43% / 38%

■ Lompoc (N=104)
▪ BOP-wide (N=8,386)

Please identify which, if any, of the following strategies your institution is currently employing to facilitate inmates' ability to communicate with family and friends outside the institution with whom they would normally interact.  (Top 3 Responses)

■ Lompoc (N=102)   ▪ BOP-wide (N=8,339)



The institution has decreased inmates' ability to communicate with family and friends outside the institution by limiting access to telephones and TRULINCS terminals. — 46% / 9%

Each inmate is provided additional TRULINCS minutes at no cost. — 26% / 65%

Each inmate is provided additional stamps at no cost. — 22% / 4%

*Note: TRULINCS is the BOP's email system for inmates.*

Please identify which, if any, of the following strategies your institution is currently employing to facilitate inmates' ability to communicate with legal counsel.  (Top 4 Responses)

■ Lompoc (N=102)   ▪ BOP-wide (N=8,314)

I don't know. — 60% / 54%

Inmates have access to their counsel when requested, through institution phones. — 17% / 35%

Each inmate is provided additional TRULINCS minutes at no cost. — 11% / 28%

Each inmate is provided additional stamps at no cost. — 11% / 3%

# TIMELINE OF BOP GUIDANCE

**January**

**31**

**The BOP Issued Action Plan Phase One:**
- Identified the potential risk of exposure within BOP facilities and informed recipients about risk factors, symptoms to look for, and preventive measures.
- Recommended screening all new inmate arrivals to the BOP for COVID-19 risk factors and symptoms using a provided screening questionnaire.
- Recommended use of PPE for those in close contact with individuals who are suspected of being infected or individuals who have been diagnosed with COVID-19.

**February**

**29**

**The BOP Issued Updated Guidance for COVID-19 to BOP Medical Staff:**
- Recommended screening staff with potential risk factors and all new inmate arrivals using a screening questionnaire.
- Recommended conducting fit-testing for N95 respirators, disseminating information about proper PPE use, and establishing baseline supplies of PPE.
- Recommended establishing communication with local public health authorities, identifying possible quarantine areas, and alerting visitors that people with illnesses will not be allowed to visit.

**9** — The BOP issued screening and leave guidance for staff.

**11** — The World Health Organization declared COVID-19 a pandemic.

**13**

**The BOP Issued Action Plan Phase Two:**
- Suspended internal inmate movements for 30 days (exceptions for medical treatment and other exigencies) and legal visits (exceptions on a case-by-case basis), social visits, and volunteer visits.
- Canceled staff travel and training.
- Instructed institutions to assess inventories of food, medicine, cleaning supplies, and sanitation supplies.
- Required screening of staff (by self-reporting and temperature checks) "in areas with sustained community transmission" and all new BOP inmates and quarantining inmates where appropriate (those with exposure risk factors or symptoms).
- Required Wardens to modify operations to maximize social distancing, such as staggering meal and recreation times, for 30 days.

The BOP issued a memorandum to Chief Executive Officers outlining necessary inmate mental health treatment and services during social distancing.

**March**

**18**

**The BOP Issued an Update to Action Plan Phase Two:**
- Stated that additional accommodations could be made for staff in high risk categories.

**The BOP Issued Action Plan Phase Three:**
- Provided guidance for non-institutional locations that perform administrative services.

**19** — The first two BOP staff were presumed positive for COVID-19.

**20** — The BOP issued guidance re-prioritizing outside medical and dental trips.

**21** — The first BOP inmate tested positive for COVID-19.

**23** — The CDC issued Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities.

**The BOP Issued Action Plan Phase Four:**

- Required all new inmates to be screened using a screening questionnaire and temperature check. If asymptomatic, inmates were to be quarantined for at least 14 days or until cleared by medical staff. If symptomatic, inmates were to remain in isolation until they tested negative for COVID-19 and were medically cleared.
- Required all inmates to be screened upon exiting the facility. Any symptomatic inmates were to be placed in isolation.
- Required all staff/contractors/other visitors to be screened upon entering the facility using screening questionnaire and temperature check.
- Required institutions to develop alternatives to in-person court appearances.
- Required all non-bargaining unit positions to comply with and participate in the respiratory protection program, including completing medical clearance, training, and fit-testing for N95 respirators.

**The BOP Issued an Update to Action Plan Phase Four:**

- Required inmates transferring within the BOP, in addition to new inmates, to be screened upon arrival.

**The BOP Issued Action Plan Phase Five:**

- Enacted a 14-day nationwide action, effective April 1, to minimize movement within BOP facilities.
- Emphasized continued and ongoing screening of all inmates to identify asymptomatic cases and encourage early reporting by inmates of symptoms.
- Required prompt and thorough contact tracing investigations for symptomatic cases, quarantining close contacts of suspected or confirmed COVID-19 cases, and isolating any inmates with symptoms similar to COVID-19.
- Emphasized good hygiene and cleaning practices.
- Required institutions to limit staff movements to the areas to which they were assigned.
- Limited inmate movements to prevent group gatherings and maximize social distancing. Directed work details to continue with appropriate screening.
- Worked with the U.S. Marshals Service to limit inmate movements between institutions.
- Required all staff to be fit-tested for N95 respirators (included shaving all facial hair).
- Announced that UNICOR had initiated the manufacturing of face masks for inmates.

The BOP issued a memorandum directing Chief Executive Officers to: (1) establish a point of contact with local public health officials and local hospitals, if not already established, and (2) be responsive and transparent with outside stakeholders to demonstrate that the BOP is taking aggressive action to mitigate the spread of COVID-19.

The CDC issued new guidance recommending the use of cloth face coverings in addition to social distancing.

The BOP issued a memorandum to Chief Executive Officers indicating that it was working to issue face masks to all staff and inmates to lessen the spread of COVID-19 by asymptomatic or pre-symptomatic individuals.

The BOP issued a memorandum to Chief Executive Officers establishing that all inmates being released or transferred from a BOP facility into the community be placed in quarantine for 14 days prior to release.

**The BOP Issued Action Plan Phase Six:**

- Extended guidance issued in Phase 5 through May 18.

The BOP expanded COVID-19 testing to include asymptomatic inmates following the acquisition of rapid ribonucleic acid testing equipment at select BOP facilities.

**The BOP Issued Action Plan Phase Seven:**

- Extended guidance issued in Phase Six through June 30.

**The BOP Issued Action Plan Phase Eight:**

- Extended guidance issued in Phase Seven through July 31.
- Established new procedures for in-person court trips and inmate movement between BOP institutions.
- Required COVID-19 testing of all incoming inmates.

**Source:** OIG analysis of documents provided by the BOP